HUBCO, INC., Hudson United Bank, and James C. McClave, Plaintiffs,

v.

Laurence J. RAPPAPORT, Lawrence B. Seidman, L. Enterprises, Hudson Financial, and John Does 1 to 10, Defendants.

Civ. A. No. 84–4413.

United States District Court, D. New Jersey.

Nov. 1, 1985.

Clapp & Eisenberg, Newark, N.J., for plaintiffs.

Cole, Geaney, Yamner & Byrne, Paterson, N.J., for defendants.

OPINION ·

SAROKIN, District Judge.

Outsider challenges to corporate management characteristically take on the dimensions of warfare. Battles are waged by proxy, in the courts and in the press. Military and Arthurian metaphors are applied to the various actors and their maneuvers. The costs, both public and private, are tremendous.

This case is no exception. It has already generated three lawsuits, only one of which is presently before this court, two applications for emergency relief before this court alone, at least one emergency shareholders'

meeting, two proxy fights, and, evidently, some press attention. The case involves a struggle between incumbent management of a publicly-held corporation, a bank holding company, and an insurgent group. The court in such cases must be wary not to upset the delicate balances of the marketplace, and at the same time, protect the shareholders and the public.

Before the court at this time is the defendants' motion for summary judgment as to Count 1 of the complaint, the only count remaining after a stipulation by the parties dismissing all other counts without prejudice. Because the court finds that plaintiffs' claims for relief in Count 1 are either without legal or factual basis, or have been mooted by developments subsequent to the filing of the complaint, the court will grant defendants' motion.

## I. *Background*

The plaintiffs are Hudson United Bank, a New Jersey bank, HUBCO, Inc., the bank's holding company, and James C. McClave, chairman of HUBCO's Board of Directors and the beneficial owner of 18,815 shares of HUBCO stock. At the outset of this litigation, the incumbent Board owned approximately 14 percent of HUBCO stock, considering each director's individual holdings.

Defendants Laurence J. Rappaport and Lawrence B. Seidman are attorneys and real estate entrepreneurs as well as substantial HUBCO shareholders. Defendant L. Enterprises is a New Jersey general partnership, of which Rappaport and Seidman are the only partners, which is engaged in the business of real estate development. Defendant Hudson Financial Associates (HFA) is a New Jersey limited partnership formed for the purpose of acquiring HUBCO stock. Since it commenced business on October 22, 1984, HFA has acquired 9.64 percent[1] of the issued and outstanding shares of HUBCO, apparently the largest block of HUBCO stock

---

**1.** According to defendants' May 28, 1985, Schedule 13D, the latest such filing made available to the court.

owned by any single entity, apart from the incumbent Board.

Rappaport and Seidman commenced their acquisition of HUBCO stock in the spring of 1984. They began soliciting members of HFA in August, 1984. After two preliminary meetings with HUBCO management in February and June of 1984, Rappaport and Seidman attempted, in September, 1984, to gain a position on HUBCO's Board of Directors and to gain access to the HUBCO shareholder list.

In response to these developments, plaintiffs commenced this action on October 24, 1984, seeking an order: (1) requiring defendants to divest themselves of all HUBCO shares beneficially owned by them; (2) enjoining defendants from acquiring or attempting to acquire any HUBCO stock or soliciting any proxies pending compliance with certain banking and securities regulations, from using their interests in HUBCO shares to affect the management of HUBCO, and from taking "any other steps in furtherance of defendants' unlawful scheme," Complaint, ¶ B(v); and finally, (3) declaring that HUBCO is entitled to refuse to transfer on its books any shares purchased by defendants, and to refuse to recognize votes with respect to shares owned by defendants. Plaintiffs alleged, in what defendants have emphasized is an unverified complaint, that "Defendants intend to use their position [of control] to force the Bank to make loans to defendants ... on preferential terms and conditions not available to any other borrower at the Bank," Complaint, ¶ 12, in order to "fuel the leveraged real estate ventures which Rappaport and Seidman have promoted, or in which they are involved." *Id.*, ¶ 14. In their Complaint, plaintiffs charged that defendants have filed a false and misleading Schedule 13D with the Securities and Exchange Commission and the American Stock Exchange by not revealing the true nature of their enterprise and their intention to acquire control, as well as their improper motivation for acquiring control, ¶ ¶ 16, 28–32, 37–42; that defendants violated section 14(a) of the Securities and Exchange Act by, in effect, soliciting proxies

without complying with that section's requirements, ¶ ¶ 17, 44–50; that defendants and ten "John Doe" defendants from whom Rappaport and Seidman solicited support, became a "bank holding company" by acquiring more than a ten percent beneficial interest in HUBCO, and that they violated banking laws by failing to obtain the prior approval of the Board of Governors of the Federal Reserve Systems, ¶ ¶ 58–71; that defendants violated the Federal Reserve Act because they had the power to vote more than ten percent of the voting securities of HUBCO and they solicited loans from the Hudson United Bank "on terms not substantially the same as those prevailing at the same time at the Bank for comparable transactions with other persons," ¶ ¶ 75, 72–77; and that defendants violated the Federal Deposit Insurance Act and New Jersey banking law by engaging in unsound business practices while participating in the affairs of the Bank, ¶ ¶ 78–84.

Defendants strenuously deny plaintiffs' allegations of improper motivation or improper solicitation of loans. On November 7, 1984, defendants instituted an action themselves in the Superior Court of New Jersey, Chancery Division, Hudson County, to compel release of the shareholders list to them. On November 21, 1984, on the eve of the Thanksgiving weekend, in a move approved by HUBCO's Board of Directors at an October 16, 1984, meeting, HUBCO mailed out notices of a special shareholders' meeting scheduled for December 11, 1984. The meeting was called to consider and vote upon a series of proposed "antitakeover" amendments to HUBCO's certificate of incorporation. HUBCO did not begin to release the shareholders list to defendants until December 3, 1984, the day an evidentiary hearing was scheduled in the state court on the question of the list's release.

On December 3, 1984, defendants filed an answer and counterclaim in this action, alleging that plaintiffs themselves had violated section 14(a) of the Exchange Act by mailing false and misleading communications to their shareholders in connection

with the special meeting. At the same time, they sought a stay of the December 11 meeting on the ground that the plaintiffs' resistance to turning over the shareholders list and the short notice upon which the meeting was called left them with insufficient time to prepare competing proxy materials.

On December 7, 1984, the court granted defendants' application for a stay. In addition to finding that the various equitable requisites for preliminary relief were satisfied, the court found that

> defendants are likely to succeed in establishing that plaintiffs have violated their duty to shareholders by scheduling a meeting with insufficient notice to provide defendants with adequate time to present their opposing views to other shareholders. Indeed, defendants are likely to succeed in establishing that plaintiffs intentionally withheld both the shareholders list and information regarding the scheduled meeting for the very purpose of denying defendants the opportunity to communicate with other shareholders.

Transcript, 12/7/84, pg. 15, ll. 4–12. The meeting was rescheduled by consent of the parties for January 4, 1985. The court explicitly did not rule on the merits of defendants' challenge to plaintiffs' solicitation in favor of the proposed amendments, or on the legality of the amendments themselves, preferring to await the outcome of the vote rather than ruling in the abstract.

Quoting and italicizing the language of the court, defendants mailed out their own proxy solicitations on December 3, 1984. They claimed that "the overall design and effect of the proposed amendments is to perpetuate incumbent management in control, to the disadvantage and detriment of shareholders, HUBCO and Hudson United Bank." Exhibit 24 to Plaintiff's Mem. of Law in Opposition to Motion for Summary judgment, at 2. At the rescheduled meeting, the amendments were nevertheless adopted by the shareholders, with the exception of proposed Amendment No. 2, which was withdrawn when it appeared that its passage would result in HUBCO's delisting on the American Stock Exchange.

Thereafter, the court heard argument on the defendants' motion for summary judgment with regard to the plaintiffs' claims against them. Defendants argued that plaintiffs' claims under section 13(d) were mooted by amendments to defendants' Schedule 13D, or were unsubstantiated, or insufficiently particular under Federal Rule of Civil Procedure 9(b); that plaintiffs' claims under section 14(a) of the Exchange Act were baseless because defendants did not contact more than ten shareholders in connection with any solicitation of shareholders prior to its December 13 proxy solicitation; and that plaintiffs' claims under the remaining regulatory banking provisions did not state a cause of action because those provisions afford no private right of action in favor of a bank holding company for the relief sought and because the claims were factually insufficient. The court reserved decision.

In the ensuing weeks, defendants sought and obtained leave to file a supplemental counterclaim challenging the conduct of the January 4th meeting. Defendant Seidman ran unsuccessfully for election to a presently occupied seat on the HUBCO Board of Directors at the March 26, 1985, annual meeting of shareholders. An action by plaintiffs filed on December 27, 1984, in the Superior Court of New Jersey, Law Division, Hudson County, alleging libel, slander, and tortious interference with contractual relations and prospective economic advantage against the individual members of the Board and their attorney, Robert Jossen, was removed to this court, only to be remanded for lack of jurisdiction. And, the parties continued to engage in discovery at a fast and furious pace, at least once requiring the intervention of the court to rule that the words "reasonable notice" in Federal Rule of Civil Procedure 30(b)(1) meant more than one day.

In the course of this discovery, plaintiffs received from defendants a copy of a "Notice of Change in Control" filed by the defendants with the Federal Reserve Board

on September 19, 1984, pursuant to the Change in Bank Control Act, 12 U.S.C. § 1817(j). Plaintiffs seized upon this notice, claiming that it indicated defendants' intention in September, 1984, to acquire more than twenty-five percent of the stock of HUBCO. They offered this document as proof of the defendants' nefarious intention to deceive HUBCO shareholders and the court, claiming that it contrasted with a declaration in an affidavit filed by defendant Seidman on December 3, 1984, in support of defendants' application for a stay of the special shareholders' meeting, and that it should have been disclosed under a previous discovery request. In addition, plaintiffs claimed to have uncovered proof of defendants' conspiracy with third parties to acquire HUBCO stock as part of a "group" within the meaning of section 13(d), without disclosing the existence of the group as required by that provision, and without obtaining approval for such additional acquisitions as required under the Change in Bank Control Act. Specifically, plaintiffs claimed to have evidence of a secret agreement between defendants and one Robert Kessler in which Kessler purportedly agreed to acquire stock on behalf of defendants.

Based on these discoveries, plaintiffs sought a preliminary injunction enjoining the defendants from acquiring or soliciting the purchase of any securities of HUBCO pending the filing of amendments to their Schedule 13D disclosing certain facts the plaintiffs deemed to be material. Defendants countered with arguments that the facts whose disclosure was sought were not material, and by supplying a proposed amendment to their Schedule 13D in the event the court should require one to be filed. The proposed amendment, see Affidavit of Lawrence Seidman, 4/26/85, Exhibit B, included an announcement that defendant HFA planned to send letters to the United States Attorney's Office, the Hudson County Prosecutor's Office, the Federal Reserve Board, and the Securities and Exchange Commission, requesting that they commence an investigation into the activities of HUBCO's Board of Directors in connection with this litigation. Plaintiffs replied by leveling charges that defendants' counsel's pursuit of an investigation by these authorities would constitute a breach of the Code of Professional Responsibility.

In the midst of this cross-fire, at oral argument on the plaintiffs' motion for preliminary relief, defendants announced that they had made certain commitments to the Federal Reserve Board in order to obtain its approval to purchase up to 14.4 percent of HUBCO's stock. As a condition to obtaining the Board's approval, defendants agreed that they would not:

1. seek or accept any representation on Hubco's Board of Directors or that of its subsidiary, Hudson United Bank;

2. propose a director or slate of directors in opposition to a nominee or slate of nominees proposed by the management or Board of Directors of Hubco or the Bank;

3. seek or have any representative serve as an officer, agent or employee of Hubco or the Bank;

4. attempt to influence the dividend policies and practices of Hubco or the Bank;

5. attempt to influence in any respect the loan and credit decisions or policies of Hubco or the Bank, the pricing of services, any personnel decisions, the location of any offices, branching, the hours of operations or similar activities of Hubco or the Bank;

6. solicit proxies or participate in any solicitation of proxies with respect to any matter presented to the shareholders of Hubco or the Bank;

7. exercise or attempt to exercise a controlling influence over the management or policies of Hubco or the Bank; or

8. enter into any other banking or non-banking transactions with Hubco or the Bank;

9. vote for Mr. Kessler as a director of Hubco, Inc.

10. acquire any Hubco shares from Robert Kessler.

See plaintiff's letter to the Court, June 4, 1985, Exhibit, pg. 3–4. Defendants claimed

that these commitments mooted plaintiffs' request for preliminary relief.

Thereafter, defendants filed their fourth amended Schedule 13D, announcing these commitments. Defendants also announced that they would "seek to have the[se] commitments modified" in the future. *Id.* Moreover, they announced their "plan to acquire sufficient stock and authorization from the Federal Reserve to have some influence and/or control over the operations of Hubco and its subsidiaries," and that "if and when [they gained] such approval, they intend[ed] to cause the Board of Directors of Hubso [sic] to consider and review all aspects of its business to enhance and perhaps expand its operations and profitability; such influence may and probably will result in changes in the present management of the issuer." *Id.* They also revealed that they were engaged in discussions with "an unrelated third party" with the aim of selling one half of their shares of Hubco and executing a voting trust. They explained that any such transaction would "not be effective or operative unless and until the Federal Reserve grants approval for same." *Id.*

After receiving this documentation from defendants, plaintiffs notified the court that they would withdraw their motion for a preliminary injunction. Plaintiffs informed the court that

> HUBCO believes that defendants' recent amendment leaves the public record seriously incomplete. Nonetheless, it does contain the central elements of relief sought in plaintiffs' motion for a preliminary injunction. Specifically, the amendment discloses that defendants are planning to seek a position of control in HUBCO, and also discloses the commitments made by defendants to the Federal Reserve Board pertaining to Mr. Kessler. This information at least assures that, at long last, the investing public has been apprised of defendants' intention to seek control of HUBCO.

Letter to the Court, June 4, 1985, at 3.

In light of the defendants' commitments to the Federal Reserve, and plaintiffs' withdrawal of their motion, the court issued an order on June 12, 1985, directing the parties to confer with the magistrate for the purpose of clarifying which issues remained to be determined by the court. Pursuant to this order, on July 17, 1985, the parties filed a stipulation in which Counts II through VI of the complaint were withdrawn without prejudice, leaving only Count I of the complaint remaining. As noted, Count I alleges that defendants filed a false and misleading Schedule 13D in violation of section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d). For the following reasons, the court finds that defendants are entitled to summary judgment on this count.

## II. *Discussion*

### A. *The Scope of Relief Available to an Issuer Under Section 13(d) of the Exchange Act*

Section 13(d) of the Exchange Act was enacted as part of the Williams Act of 1968, which amended the Exchange Act "to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies." S.Rep. No. 550, 90th Cong., 1st Sess. 4; H.R.Rep. No. 1711, 90th Cong., 2d Sess. 4 (1968); *reported in* U.S.Code Cong. & Admin.News pp. 2811, 2814. Section 13(d), in particular, was designed "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *G.A.F. Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). In pertinent part, it provides that

> [a]ny person who, after acquiring directly or indirectly the beneficial ownership of any [specified] equity security ... is the beneficial owner of more than 5 per centum of such class [of security] shall, within ten days after such acquisition,

send to the issuer of the security ..., send to each exchange where the security is traded, and file with the Commission, a statement ....

The statement is to contain certain items of information, which have been designated in the regulations of the Securities and Exchange Commission. *See* 17 C.F.R. 240.-13d–101. They include the identity of the security and its issuer (Item 1); the identity and background of the five percent owner (Item 2); the source and amount of funds or other consideration used to purchase or acquire the stock (Item 3); the purpose of the transaction, focusing on any intent to change the management, policies, structure or governance of the issuer, (Item 4); the aggregate interest of the five percent owner in the issuer's stock, including power to vote or dispose of the stock (Item 5); any contracts, arrangements, understandings or relationships the five percent owner has with respect to the securities of the issuer (Item 6); and certain specified exhibits, including copies of agreements relating to the other items (Item 7).

Section 13(d) does not, by its terms, create a right of action in favor of any private party to redress a violation. Thus, the threshold question, curiously not raised directly by the defendant, although touched upon by the plaintiffs, is whether any right of action at all may be implied under section 13(d) on behalf of the issuer of the securities in question, as opposed to the corporate shareholders. Assuming that some right of action does exist in favor of any issuer, the next question is what relief may be granted.

These are indeed thorny questions going to the heart of the purpose and policy behind the Williams Act. On the one hand, "the sole purpose of the Williams Act was the protection of investors ...." *Piper v. Chris-Craft Industries,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977) (refusing to imply damages remedy in favor of unsuccessful tender offeror under provision of Williams Act). The Act was intended to be evenhanded as between incumbent management and its challengers:

By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation in favor of management or in favor of the person making the takeover bid." S.Rep. No. 550, 90th Cong. 1st Sess. 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 4 (1968).

*Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58–59, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975). *See also Edgar v. Mite Corp.,* 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982). By implying a right of action on behalf of the issuer, courts may be creating a weapon for incumbent management to obstruct, delay, or exhaust their opponents and thus tip the scales in favor of management, as Congress was loath to do. On the other hand, individual shareholders may not have the resources or information at their command to launch actions against unscrupulous raiders. S.E.C. resources might be inadequate as well. Absent intervention by the issuer, the interests of shareholders might go unprotected.

This issue has generated some difference of opinion among the Circuit Courts of Appeals. In what appears to be the leading case denying the issuer a right of action, *Liberty National Insurance Holding Co. v. Charter Co.,* 734 F.2d 545 (11th Cir.1984), the Eleventh Circuit held that issuers have no implied right of action under section 13(d) to seek an order rescinding a five percent owner's purchase of stock, enjoining the owner to sell its shares on the open market, or restraining the own-

er from voting or otherwise exercising its rights in its shares pending divestiture.[2]

In a lengthy, well-reasoned opinion, the Eleventh Circuit ruled that the plaintiff issuer did not meet the four criteria for implication of a cause of action enunciated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

> (1) whether the plaintiff is a member of a class for whose especial benefit the statute was enacted; (2) whether there is any explicit or implicit indicator of Congressional intent to create or deny this private remedy for this plaintiff; (3) whether this private remedy for this plaintiff would be consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Liberty National*, 734 F.2d at 561.[3] The court found that only the fourth prong of the *Cort v. Ash* test was satisfied. As to the first prong, it observed, citing *Piper v. Chris-Craft Industries, Inc., supra,* that the sole purpose of the Williams Act was to protect present and potential investors, not corporations as such. 734 F.2d at 561. Thus, section 13(d) was not enacted for the "especial benefit" of corporate issuers of stock. As to the second prong, after surveying "the statutory language, the contextual setting, the Supreme Court's interpretation of subsidiary questions and the relationship between the alleged wrong and the [injunctive] relief requested ..." the Court concluded that "there is no clear legislative intent to imply an issuer right of action to obtain the ouster of a shareholder who has made a false Schedule 13D filing." *Id.* at 565–66. Finally, as to the third prong, the court found that the relief sought by the issuer was inconsistent with the legislative scheme embodied in the Williams Act. Not only would implication of a right of action unduly tip the scales in favor of management, according to the court, but the incumbent management could not be trusted to represent the interests of shareholders sought to be protected by the Act because the interests of a beseiged incumbent team and the shareholders are likely to be adverse. The court described the danger in this way:

> When an outsider is perceived as threatening to displace the insiders, management has a clear economic interest in protecting its position, even though this might not be in the economic interest of the firm or its shareholders. The creation of a private right of action on behalf of the firm would allow incumbent management to use corporate resources, rather than their own, to harass and burden aggressive outsiders. Moreover, it would be difficult for the outsider to avoid vexatious litigation by any manner of careful draftsmanship in his filing; all the incumbent management would have to demonstrate to maintain its claim for relief would be that the outsider's schedule 13D statement of his intentions with respect to the issuer was false or misleading. Whether the outsider is unequivocal or equivocates as to his intentions, the issuer could simply allege, as *Liberty* did in this case, that his true intentions are the opposite.

*Id.* at 567. The court's final concern was with the "chilling effect" that a grant of injunctive relief to an issuer under section 13(d) would have on "the market for corporate control and the value of securities

---

**2.** For a district court opinion predating but following the logic of *Liberty National, see Equity Oil Co. v. Consolidated Oil & Gas, Inc.,* 596 F.Supp. 507 (D.Utah 1983).

**3.** The court first noted that the Supreme Court's decision in *Rondeau v. Mosinee Paper Co., supra,* did not resolve the question of whether or not Congress intended an issuer of stock to have a cause of action under section 13(d). In *Rondeau,* an issuer had requested injunctive relief against a five percent stock owner who had failed to timely file a Schedule 13D. The Court upheld the district court's denial of relief on the ground that the issuer had failed to make a showing of irreparable injury. The Court expressly noted that the question of whether the issuer had a right to bring such an action in any event had not been raised by the parties. 422 U.S. at 62.

generally." *Id.* The court feared that "[p]arties contemplating the acquisition of large holdings in publicly-traded companies would be faced with substantial transaction costs in the form of section 13(d) litigation expenses, including delay, whenever perceived by incumbent managements as a threat to their economic welfare." *Id.*

This view is somewhat more extreme than that taken by most other circuit courts considering this question. A great many other courts, ruling prior to *Liberty National*, have implied some right of action in favor of an issuer under section 13(d). *See Indiana National Corp. v. Rich,* 712 F.2d 1180 (7th Cir.1983); *Dan River v. Unitex, Ltd.,* 624 F.2d 1216, 1224 (4th Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979); *General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir.1977); *G.A.F. Corp. v. Milstein, supra; see also Portsmouth Square Inc. v. Shareholders Protective Committee,* 770 F.2d 866, n. 8 (9th Cir.1985) (differing with *Liberty National* on question of issuer's right of action under section 13(d)); *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707 (5th Cir. 1984) (same); M. Steinberg, Securities Regulation: Liabilities & Remedies § 9.03[5] pp. 9–23, 9–24 (1985). Yet these other courts have joined the Eleventh Circuit in taking a dim view of the drastic injunctive relief typically sought by issuers in section 13(d) actions, such as recision or "sterilization" of shares. *See, e.g., Gearhart Industries, Inc. v. Smith International, Inc., supra,* at 714–15 (court would not enjoin tender offer on basis of prior violations of section 13(d)); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 287 (4th Cir.1983) (court would not order "sterilization" of shares due to prior insufficient disclosure); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d at 248–49 (court would not require "cooling-off" period after submission of corrected 13D); *General Aircraft Corp. v. Lampert,* 556 F.2d at 97–98 (court would not enjoin defendants from voting legally acquired shares after section 13(d)

violation). Effectively the only relief available to an issuer, according to the prevailing view, is an order requiring the five percent owner to file a corrected 13D and perhaps enjoining further acquisitions pending the corrections. *Gearhart,* 741 F.2d at 715; *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380 (2d Cir.1980); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734, 743 (D.Del.1984); *Pantry Pride, Inc. v. Rooney,* 598 F.Supp. 891, 900 (S.D.N.Y.1984). Where an appropriate amendment to a 13D has been made, the violation is usually considered cured. *Gearhart, supra; Treadway, supra; Energy Ventures, supra; Pantry Pride, supra.*

■■■ The court agrees with this analysis. The mere failure to file a timely Schedule 13D cannot in itself amount to irreparable injury sufficient to justify equitable relief. *Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Where the only injury alleged is, as in most cases, the failure of shareholders to receive a control premium for their stock, that injury is best readdressed by an action for money damages after the fact. Indeed, it is difficult to imagine circumstances in which the extreme remedies of recision or sterilization of shares would be equitably warranted. Moreover, the availability to issuers of only the limited remedy of an amendment to the challenger's 13D comports with the interests of shareholders and the public. Where drastic injunctive relief is not available, issuers will have no incentive to bring vexatious suits against their challengers, and the suits will not have the feared "chilling effect" on would-be control purchasers. Five percent owners would be able to avoid litigation simply by filing corrected 13D's, which is, in any event, in the interests of shareholders and the public. And, courts will not be called upon to make rulings in the heat of battles for control, which inevitably upset the even-handedness of the Williams Act as envisioned by Congress. Thus, even though a right of action in favor of issuers under

section 13(d) may be said to exist, it is and should be of quite limited scope.

Neither this court nor the Third Circuit has had an opportunity to rule directly on this question.[4] This court has, several years ago, ruled that a private right of action on behalf of an issuer may be implied under section 14(e) of the Exchange Act, also a component of the Williams Act. *Ronson Corporation v. Liquifin Aktiengesellschaft,* 370 F.Supp. 597 (D.N.J. 1974). That holding was affirmed by the Third Circuit in a memorandum opinion. In an earlier *per curiam* opinion, the Third Circuit also upheld this court's grant of a preliminary injunction enjoining the acquisition or solicitation of tenders of the plaintiff issuer's shares and the voting of any share previously acquired. *Ronson Corp. v. Liquifin Aktiengesellschaft,* 483 F.2d 846 (3d Cir.1973). This precedent does not support an award of the massive injunctive relief sought here, however. Aside from dealing with a different provision of the Williams Act, the Third Circuit's decision in *Ronson* predated the Supreme Court's holdings in *Cort v. Ash, Piper v. Chris-Craft,* and *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), all of which refined and reduced the implication of remedies under the securities laws from the expansionist period which followed the Supreme Court's deci-

sion in *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (implying a cause of action under section 14(a) of the Exchange Act).[5] These Supreme Court decisions have so changed the precedential landscape in this area that, in this court's opinion, the Third Circuit's holdings in *Ronson* are no longer indicative that the Court of Appeals would recognize the claim of an issuer under the Williams Act for the relief sought here.[6]

Thus, the court doubts whether the plaintiffs have a right of action under section 13(d) for the relief they seek, other than for an order requiring the filing of a corrected 13D. The question then becomes whether even that relief is warranted. Upon a detailed examination of the charges in Count 1 of the complaint, the court finds that defendants' amendments to their original Schedule 13D moot plaintiffs' charges in almost all respects. Any charges that have not been mooted are either without factual support, or involve some item of information that is not required to be disclosed in a 13D.

## B. *Defendants' Alleged Misstatements and Omissions*

█ In their complaint, plaintiffs charged that defendants failed to disclose material facts in their original 13D in five

---

**4.** The Third Circuit has affirmed a district court decision holding that section 13(d) creates a private right of action for *shareholders,* as "the intended beneficiaries of the statute." *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050, 1063 (D.Del.), *aff'd mem.,* 707 F.2d 1392 (3d Cir. 1982).

**5.** *See* E. Aranow, H. Einhart & G. Berlstein, Developments in Tender Offers for Corporate Control, at 111–12 (1977) ("Prior to the decision in *Chris-Craft,* a target's standing under the Williams Act to sue for injunctive relief and damages was virtually unquestioned.... The majority opinion in the *Chris-Craft* case, however raises some question with regard to these holdings").

**6.** Notably, the Third Circuit has recently held that a disappointed tender offeror who is also nominally a shareholder in the target company does not have standing to sue under section 14(e) of the Williams Act simply by virtue of its

status as a shareholder. *Kalmanovitz v. G. Heilman Brewing Co.,* 769 F.2d 152 (3d Cir.1985). The court, recognizing that "the sole purpose of the Williams Act was the protection of *investors* ..." *id.* at 158, quoting *Piper v. Chris-Craft Industries,* 430 U.S. at 35, 97 S.Ct. at 946 (emphasis supplied), relied in part on the fact that

> there may well be a conflict of interest between the positions of a target shareholder and a tender offeror. It would almost be a sham to permit an individual to bring suit formally in his capacity as a shareholder, when the suit is not in the interest of the target shareholders and in fact the person's true motivation, and his only real stake in the matter, stems from his position as an offeror.

This holding manifests an openness on the part of the Court of Appeals to the argument that an issuer and its incumbent management lack standing to sue under the Williams Act due to a potential conflict of interest with shareholders, who alone are the intended beneficiaries of the statute.

major areas. First, they alleged that defendants failed to disclose their "true plans and intentions concerning HUBCO and the Bank," including their asserted interest in using the bank to further their real estate ventures by obtaining preferential loans, as purportedly required in Items 4(c), (e) and (j) of Schedule 13D. Complaint, ¶ 37. Second, plaintiffs alleged that defendants did not include specific information on the source and amount of funds used to purchase shares of HUBCO, as required in Item 3. *Id.*, ¶ 38. Third, plaintiffs alleged that defendants failed to disclose that they were affiliated with a "group" of investors acquiring shares pursuant to an agreement within the meaning of 17 C.F.R. 240.13d-5(b)(1), and that they failed to disclose the alleged understandings and arrangements between the members of said group. *Id.*, ¶ 39. Fourth, plaintiffs alleged that defendants failed to state that they would be required to comply with certain banking regulations before acquiring additional shares of HUBCO stock. *Id.*, ¶ 40. Lastly, plaintiffs alleged that defendants failed to supply information concerning the background and identity of defendants "and those acting in concert with them." *Id.*, ¶ 41.

With respect to their first charge regarding defendants' intention to obtain preferential financing, plaintiffs rely on a series of loan applications submitted to Hudson United Bank, as well as on the testimony of one Richard Morash, defendants' broker at the firm of Moseley, Hallgarten, Estabrook and Weeden, Inc., to support their claim. The parties have identified six loan applications made to HUBCO to which defendants were connected in some way, one of which was an application by defendants themselves, and five of which were simply referred by defendants. These applications are of mixed significance. The loan application on the part of defendants themselves, to finance a real estate venture known as "Plaza 12," was withdrawn when it became clear that HUBCO would not match a rate defendants had been quoted by another bank. Seidman Aff., 12/2/84 ¶ 21; Clark Dep. 186; Neilson Dep. 42–43.

The fact that defendants sought this funding, especially at a rate already quoted to them by another bank, is no indication of any nefarious intent: at the time, defendants were merely shareholders at the bank, and the record indicates that the bank often did business with shareholders, and even, on occasion, with directors. McClave Dep. 67; Clark Dep. 183–4, 188.

Of the five other loan applications, which were simply referred by defendants, three were granted. Although the bank claims that the loans were granted at interest rates lower than those that would ordinarily be charged in equivalent circumstances, it is admitted that plaintiffs chose to make the loans at the lower rates requested in order to cultivate a business relationship with the loan applicants. Neilsen Dep. 14. The fact that defendants referred these loans to the bank is not evidence of any intent to use the bank for their own purposes: as noted in the depositions of plaintiffs' officers, referrals from HUBCO directors to the bank were not only tolerated, but were expected, McClave Dep. 104–5, and the defendants were specifically encouraged to refer loan business to the bank. McClave Dep. 85, 96; Neilsen Dep. 37; Seidman Aff. ¶ 19; Morash Dep. 60. Plaintiffs suggest that some conflict of interest existed on the part of defendants because defendants solicited the individuals whom they had referred to the bank for loans to become members in HFA while their loan applications were still pending, Plaintiffs' Mem. at 27, but it is not clear how this could have amounted to any improper use of influence in obtaining the loans, where the plaintiffs admit that they did not know of the existence of HFA or of any plan to acquire HUBCO stock at the time the loan decisions were made.

The two remaining loans referred by defendants were rejected because the bank determined that the applicants were not sufficiently credit worthy. With regard to at least one loan, the "LaSala loan" the HUBCO loan officer involved reported receiving threats of reprisals against the bank from defendant Seidman. Neilsen

Dep. 43, 76; Plaintiffs' Exh. 16. Unlike defendants' conduct with respect to the other loans, this might support an inference that Seidman sought to pressure HUBCO officials into making loans to business friends on a preferential basis. In addition, the testimony of Richard Morash indicates that defendants' initial intention in obtaining HUBCO stock was to acquire a "meaningful position" with the bank which would enhance their banking relationship for loan purposes. Morash Dep. 40, 48. Although Morash indicates that defendants' intention evolved into an interest in investing in the bank as a business itself, Morash Dep. 96–8, his testimony arguably supports an inference that defendants were motivated in some part by the intent to obtain financing for their own interests.

Since the time of the LaSala loan and the events referred to by Morash, however, the defendants entered into the commitments with the Federal Reserve Board memorialized in their fourth amended Schedule 13D, including the commitment not to attempt to influence the loan decisions of the bank and not to enter into any other banking or non-banking transactions with HUBCO or the bank. The record contains no evidence at all to indicate that defendants do not now intend to honor these commitments, unless and until they are altered by agreement with the Federal Reserve. Indeed, plaintiffs' withdrawal of their motion for a preliminary injunction apparently accepted the defendants' commitments as trustworthy. On the record before it, the court therefore cannot find that there exists any issue of fact as to whether defendants now intend to use the bank for the purpose of obtaining preferential financing so as to warrant denial of defendants' motion.

With regard to plaintiffs' charge that defendants failed to disclose their interest in obtaining control of HUBCO and their alleged plan to acquire a specific percentage of its stock, any such failure to disclose

is cured by defendants' fourth amendment to their 13D, in which defendants announce their plan to seek control and to acquire up to forty-nine percent of HUBCO's stock.[7] The fact that this announcement corrects the public record is in fact admitted by plaintiffs in the withdrawal of their motion for preliminary relief.

Likewise, any failure to disclose the source and amount of funds used to purchase HUBCO stock has been cured in amendments to the original 13D, which append all applicable margin agreements and line of credit documents, as well as the HFA partnership agreement. As noted by defendants, section 13(d) does not oblige them to disclose the source and amount of funds used to purchase HUBCO shares up to the five percent figure triggering the 13D filing requirement, unless such information is "material." Plaintiffs have not challenged defendants' determination, implicit in their decision not to include such information in their 13D, that the information is not material. The court also agrees with defendants that they are not required to identify the limited partners in HFA. The instructions for completing a Schedule 13D, 17 C.F.R. § 240.13d–101(C), specifically provide that

> If the statement is filed by a general or limited partnership, syndicate, or other group, the information called for by Items 2–6, inclusive, shall be given with respect to (i) each partner of such general partnership; (ii) each partner who is denominated as a general partner or who functions as a general partner of such limited partnership; (iii) each member of such syndicate or group; and (iv) each person controlling such partner or member.

The court finds that this specific instruction, requiring information only from the general partner in a limited partnership, controls over the more general instruction

---

**7.** The court notes that this ruling does not amount to a finding that defendants in fact had the intention of gaining control of or acquiring any specific percentage of HUBCO's shares at the time they filed their original 13D and the initial amendments. The court rules only that, regardless of defendants' original intent, plaintiffs have asserted no ground to fault the record as it now stands.

in Item 3 upon which plaintiffs rely. *See* 17 C.F.R. § 240.13d–101(C) (Item 3) ("if any part of the purchase price is or will be represented by funds or other considerations borrowed or otherwise obtained for the purpose of acquiring, holding, trading or voting the securities, [provide] a description of the transaction and the names of the parties thereto"). Plaintiffs cite no caselaw for their proposition that "General Instruction C(ii) of Schedule 13D, which requires disclosure of only the general partners in a limited partnership, is intended to govern only limited partnerships which were not specifically organized for the purpose of acquiring the issuer's securities ...." Plaintiffs' Mem. at 50–51 n. *.

■ The court also finds that defendants cannot be faulted for their alleged failure to disclose information regarding those "acting as a group and in concert with defendants." Complaint, ¶ 39. Defendants have denied in sworn affidavits that any such group exists, *see* Seidman Aff. ¶ 12; Rappaport Aff. ¶ 2, apart from the limited partnership of HFA, which has been disclosed. Plaintiffs have come forward with no factual support for their claim that such a group exists. They suggest that a group was formed at the time defendants began distributing a private placement memorandum and confidentiality agreement in connection with the solicitation of limited partners for HFA. Yet that agreement required only that individuals solicited not disclose the defendants' intention to acquire shares of HUBCO, and that they not purchase or recommend the purchase of HUBCO stock. *See* Plaintiffs' Exhibits 3, 6. It was not an agreement to "act together for the purpose of acquiring, holding, voting or disposing of equity securities of

an issuer" within the meaning of section 13(d)(3) and 17 C.F.R. § 240.13d–5(b)(1), so as to trigger any reporting requirement. Plaintiffs have produced no other evidence to indicate the current existence of any "group" other than HFA which might require disclosure.[8] Notably they have not claimed that defendants' failure to disclose the confidentiality agreement and private placement memorandum violated Item 6 of Schedule 13D, 17 C.F.R. § 240.13d–101(C) (Item 6) ("Describe any contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 and between such persons and any person with respect to any securities of the issuer, including but not limited to transfer or voting of any securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of profits, division of profits or loss, or the giving or withholding of proxies ...").

■ Moreover, plaintiffs' complaints that defendants have failed to provide complete information regarding HFA have been cured by defendants subsequent 13D amendments, in which a copy of the HFA partnership agreement and other information was furnished. The court agrees with defendants that the literal terms of Schedule 13D do not require the disclosure of L. Enterprises, except insofar as it was the source of funds to purchase HUBCO stock, which fact was disclosed in defendants' third amendment. Matters not set out in the S.E.C. rules and regulations promulgated under section 13(d) need not be disclosed. *Saunders Leasing System, Inc. v. Societe Holding Gray D'Albion, S.A.*, 507 F.Supp. 627, 635 (N.D.Ala.1981). Accord-

---

8. As noted in their motion for preliminary relief, plaintiffs claimed to have uncovered evidence of a secret agreement between defendants and Robert Kessler in which Kessler purportedly agreed to acquire stock on defendants' behalf. Aside from the fact that the existence of any such agreement has been denied by both Kessler and defendants, Seidman Aff., 5/1/85, ¶ 2; Kessler Dep. 63, defendants have committed themselves not to vote for Kessler as a director of HUBCO and not to acquire any shares from Kessler, as well as not to seek any position of influence in HUBCO themselves, in their agreement with the Federal Reserve. Plaintiffs have offered no evidence that said commitments are not trustworthy; indeed it was on the strength of said commitments that plaintiffs' motion for preliminary relief was withdrawn. Accordingly, the court finds that no disclosure regarding any alleged agreement with Kessler can be required, even if plaintiffs' claims were factually supported as to Kessler.

ingly, defendants are entitled to summary judgment on this ground.

■ Furthermore, any lack of disclosure regarding the regulatory provisions governing defendants' acquisition has either been cured by amendments to defendants' 13D or is not at odds with the requirements of section 13(d). In their third amendment, defendants disclosed that they would not seek to acquire more than ten percent of the stock of HUBCO without complying with applicable banking regulations; in their fourth amendment, they disclosed their commitments to the Federal Reserve, made as a condition to obtaining Federal Reserve approval to acquire more stock, and their intent to abide by any Federal Reserve determination. No more is required under section 13(d). *See Purolator, Inc. v. Tiger International, Inc.,* 510 F.Supp. 554, 557 (D.D.C.1981) (13D does not require disclosure of regulatory restrictions on actions unless they are applicable to actions defendants have determined to take).

■ Finally, the background information that plaintiffs' claim should be disclosed has either been disclosed in the 13D amendments or is superfluous. As noted, pursuant to 17 C.F.R. § 240.13d–101(C)(ii), defendants are not required to provide background information on any of the limited partners in HFA. Nor have plaintiffs demonstrated that any information regarding L. Enterprises, other than that which has already been disclosed, is material. Even if defendants at one time held HUBCO stock in the name of L. Enterprises, section 13(d) does not require disclosure of the fact that stock is held in a nominee name. *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221, 235 (S.D.N.Y.1975). Moreover, the fact that defendants were engaged in real estate investment through L. Enterprises, as opposed to any other type of investment, simply does not seem to the court to hold the significance attached to it by plaintiffs. The defendants' involvement in real estate is only important if plaintiffs' claims of defendants' intent to obtain preferential loans are credited. As noted, however, plaintiffs have supplied the court with no information to show that the defendants have a present intent to attempt to obtain such loans, in light of their commitments to the Federal Reserve. Thus, the court cannot find defendants' failure to disclose their involvement in real estate ventures through L. Enterprises to be a violation of 13D. In judging the adequacy of a Schedule 13D statement, fair accuracy, not perfection, is the standard. *Purolator, Inc. v. Tiger International, Inc.,* 510 F.Supp. at 556, citing *Laurenzano v. Einbender,* 448 F.2d 1, 6–7 (2d Cir.1977). Defendants identified themselves in their original 13D as "attorneys and investors", and later disclosed the existence of their law firm and L. Enterprises. Absent a specific showing that any further information is material, the court determines that this disclosure is adequate.

In sum, the court finds that all of the plaintiffs' charges of inadequate disclosure have either been cured by an amendment to defendants' 13D, are without factual support, or involve some item of information that is not required to be disclosed in a 13D. For purposes of clarification, the court provides the following table of its findings with regard to each of the specific charges of non-disclosure in Count 1 of the plaintiffs' complaint:

I. First Charge:

The Schedule 13D contains materially false and misleading statements and omits to state material information with respect to defendants' true plans and intentions concerning HUBCO and the Bank, in at least the following respects:

(a) it conceals Rappaport's and Seidman's true purpose, which is to provide a source of preferential financing for their real estate activities; (not factually supported)

(b) it does not disclose the attempts Rappaport and Seidman already have made

to obtain preferential financing; (disclosure not required)

(c) it falsely states that "the number or percentage of shares to be acquired has not been determined," when in truth Rappaport and Seidman have determined to acquire in excess of twenty-five percent; (cured)

(d) it false states that Rappaport and Seidman intend to influence the "management of the issuer through cooperation," when in fact they have threatened reprisals against management if the Bank refuses to extend preferential financing to applicants chosen by Rappaport and Seidman; (cured to extent required after commitments to Federal Reserve)

(e) it does not disclose the intention of Rappaport and Seidman to gain control of HUBCO and to change its management and policies; (cured)

(f) it falsely states that Rappaport and Seidman will only seek to cause HUBCO to review its business for "the purpose of enhancing and perhaps expanding its business" if they are elected to the board of directors of HUBCO, when in fact they have already implemented plans to alter the banking policies of HUBCO's subsidiary, the Bank; (cured to extent required after commitments to Federal Reserve)

(g) it falsely states that Rappaport and Seidman have, except as disclosed, no plans or proposals which relate to or would result in what is referred to in Items 4(a) through (i) of Schedule 13D, when in truth, as set forth above, defendants have specific plans and proposals at least with respect to Items 4(a), (d) and (f); and (cured)

(h) it provides no information with respect to the plans and purposes concerning HUBCO of the limited partnership to which Rappaport and Seidman have stated their intention to contribute their shares, and which is to be used as a vehicle for raising money from investors to purchase additional HUBCO shares. (cured)

## II. Second Charge:

The Schedule 13D contains materially false and misleading statements and omits to state material information with respect to the source and amount of funds used by defendants to purchase HUBCO stock, in at least the following respects:

(a) it does not disclose the amount of funds used to purchase the HUBCO shares reported to be beneficially owned by Rappaport and Seidman; (not required to disclose for purchases prior to purchase triggering five percent ownership; otherwise disclosed)

(b) it fails to provide information on the margin accounts in which HUBCO stock is allegedly held for Rappaport and Seidman, or the financing terms made available through such margin accounts; (cured by attachment of margin agreements)

(c) it fails to include the "line of credit documents" that are listed in Item 7 as being annexed as an exhibit and that are required to be appended as exhibits in the Schedule 13D (see 17 C.F.R. § 240.-13d–101); (cured)

(d) it fails to include the margin agreements that are required to be appended as exhibits (17 C.F.R. § 240.13d–101); and (cured)

(e) it fails to disclose any information with respect to the source and amount of funds used by those acting with Rappaport and Seidman to acquire HUBCO shares. (not required for HFA limited partners; no factual support as to any others "acting with" defendants, and, in any event, effect of any agreement to act as group neutralized by commitment to Federal Reserve)

## III. Third Charge:

The Schedule 13D contains materially false and misleading statements and omits to disclose material information with respect to (a) the extent of ownership of

HUBCO stock by the defendants and by those acting as a group and in concert with the defendants, and (b) the understandings and arrangements between and among them, in at least the following respects:

(a) it fails to provide any information as to the means by which Rappaport and Seidman jointly hold shares, or as to the arrangements under which "Rappaport and Seidman each has shared power to vote and shared power to dispose of the HUBCO shares they hold;" (satisfied in original 13D and HFA partnership agreement appended to first amendment)

(b) it fails to disclose that Rappaport and Seidman have held an interest in HUBCO through L. Enterprises and Hudson Financial; (cured as to HFA; otherwise not required)

(c) it falsely states that Rappaport and Seidman beneficially own only approximately 5.08% of HUBCO's stock, when in truth Rappaport, Seidman, L. Enterprises and Hudson Financial have formed a group with other investors, who collectively control in excess of 11% of the stock of HUBCO; (not factually supported and, in any event, rendered immaterial by commitment to Federal Reserve)

(d) it fails to disclose the amount of HUBCO stock owned by those acting together with Rappaport and Seidman; (satisfied as to amount held by HFA; otherwise not factually supported and, in any event, rendered immaterial by commitment to Federal Reserve)

(e) it fails to provide any information with respect to the understandings and arrangements between and among Rappaport and Seidman and the persons acting together with them; and (satisfied by inclusion of HFA agreement; otherwise not factually supported and, in any event, rendered immaterial by commitment to Federal Reserve)

(f) it fails to disclose any information as to the agreements and understandings pursuant to which the limited partnership referred to in the Schedule 13D will acquire shares of HUBCO stock. (Cured to extent required by disclosure of HFA partnership agreement)

IV. Fourth Charge:

The Schedule 13D contains materially false and misleading statements and omits to disclose material information in that defendants have omitted to disclose that their purchases of HUBCO stock are subject to regulation by various federal and state banking authorities, in at least the following respects:

(a) it fails to disclose that Rappaport, Seidman and those acting together with them, are subject to the provisions of the CBCA since they are seeking to obtain a controlling position in the Bank; (cured to extent required)

(b) it fails to disclose that Rappaport, Seidman and those acting with them, are subject to the provisions and regulations under the CBCA, which creates a presumption of control if a person, or group of persons, controls 10% or more of the voting stock of a bank such as the Bank, and which provides that, in the event such control is exercised, such person or persons must give sixty-days prior notice to the FDIC of their intent to control the Bank, and that the FDIC is required to disallow any such application if the experience or the integrity of the acquiring persons warrants disapproval in the public interest; (cured to extent required)

(c) it fails to provide information relevant to whether Rappaport and Seidman and the persons acting together with them are persons of sufficient experience and integrity to control the Bank; (satisfied to extent required)

(d) it fails to disclose that defendants are subject to the provisions of the BHCA, since by their actions they have become a company (within the meaning of the BHCA) which is seeking to control HUBCO; (cured to extent required; otherwise not factually supported)

(e) it fails to disclose that under the BHCA, defendants are required to obtain the prior approval of the Board of Governors of the Federal Reserve System before they may acquire further shares in HUBCO pursuant to their plan; (cured)

(f) it fails to disclose that defendants have not complied with the BHCA; (not factually supported)

(g) it fails to provide information relevant to whether defendants have sufficient financial and managerial resources and are persons of sufficient experience and integrity, so as to receive the approval of the Board of Governors of the Federal Reserve System; and (satisfied to extent required)

(h) it fails to disclose that defendants' attempt to exercise control over the Bank would expose the Bank to possible sanctions and penalties under the New Jersey Banking Act as a result of defendants' plans to operate the Bank in a manner which is not prudent and which would place in jeopardy the Bank's assets. (not factually supported, and, in any event, mooted by commitment to Federal Reserve)

### V. Fifth Charge:

The Schedule 13D fails to disclose material information with respect to the background and identity of the filing persons and those acting in concert with them, in at least the following respects:

(a) it fails to provide information about, or even to identify, the law firm of Seidman & Rappaport, which is relevant to the identity and background of both Rappaport and Seidman; (cured)

(b) it fails to provide information about, or even to identify, the partnership of L. Enterprises, or Hudson Financial, which is relevant to the identity and back-

ground of Rappaport and Seidman; (cured as to HFA; not required as to L. Enterprises)

(c) it fails to disclose information on the real estate ventures of Rappaport and Seidman or L. Enterprises, and the relation of those ventures to the acquisition of HUBCO stock; (not required)

(d) it fails to identify, or to give any information about, the "limited partnership" that was allegedly formed for the purpose of acquiring additional shares of HUBCO; (cured)

(e) it fails to disclose the identity of the potential participants in such "limited partnership" and their prior involvement in the real estate syndications promoted by Rappaport and Seidman; and (not required)

(f) it fails to disclose the identities and backgrounds of any of the persons who have joined with Rappaport and Seidman in the formation of a group with respect to HUBCO stock. (not required as to HFA limited partners; otherwise not factually supported)

### III. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted as to the only count remaining in the complaint, Count 1.