**VESTCOM INTERNATIONAL, INC., Plaintiff,**

**v.**

**Harish CHOPRA, Timetrust, Inc. and R–Squared Limited, Defendants.**

**No. CIV.A. 99–5935.**

United States District Court, D. New Jersey.

Sept. 14, 2000.

Lawrence M. Rolnick, Gavin J. Rooney, Thomas E. Redburn, Jr., Lowenstein Sandler, Roseland, NJ, for Plaintiff.

Andrew P. Napolitano, Andrew W. Schwartz, Eric I. Abraham, Esq., Sills Cummis Radin Tischman Epstein & Gross, Newark, NJ, for Defendants.

### *OPINION*

WOLIN, District Judge.

This matter is opened before the Court upon the motions of defendants Harish Chopra, Timetrust, Inc., and R–Squared Limited for summary judgment dismissing counts one and two of the two-count complaint against them and for summary judgment on their counterclaim against plaintiff Vestcom International, Inc. The motions have been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the motion for summary judgment to dismiss counts one and two of the complaint will be granted and the complaint will be dismissed in its entirety. The motion for summary judgment on the counterclaim will be denied.

### BACKGROUND

The backdrop of this dispute is an attempt to gain control over the plaintiff Vestcom by defendant Chopra. Vestcom is a publicly traded corporation listed on the NASDAQ. By the close of the year 1999, Chopra, and the other defendants whom Chopra allegedly controls, had accumulated a significant portion of the outstanding Vestcom stock. He also had campaigned among other Vestcom shareholders for support in his efforts to oust Vestcom's current Board.

Persons acquiring greater than five percent of a corporation's stock are required to file Schedule 13D with the Securities and Exchange Commission pursuant to the section 13(d) of Securities and Exchange Act of 1934 (the "1934 Act"). Defendants filed a Schedule 13D indicating that they intended at a future date to seek representation on the board of directors, but that they had formed no specific plan to do so and that "there can be no assurance that any such plan or proposal will be developed." Also in the Schedule 13D, defendants indicated that they had no intent to cause a merger, reorganization or other material structural change to Vestcom.

Meanwhile, plaintiff has alleged, Chopra was campaigning among other Vestcom shareholders for support to oust the current board of directors and take control of the company. The scope of this campaign, the specific form the campaign took, and whether Chopra's contacts with Vestcom shareholders may be characterized as proxy solicitations, is disputed. Vestcom claims that Chopra contacted more than ten shareholders. No proxy statement was filed by defendants prior to this lawsuit.

On December 17, 1999, Vestcom filed its complaint. Count one alleges that defendants have violated section 13(d) of the 1934 Act in that their Schedule 13D failed to disclose that defendants had a present intent and plan to oust Vestcom's board. Count two alleges that defendants had violated the proxy rules by soliciting proxies from more than ten shareholders without filing a written proxy statement as required by section 14(a) of the 1934 Act and SEC Rule 14a.

Extensive procedural maneuvering ensued, none of which has any enduring relevance. Two subsequent, substantive events, are significant, however. On December 29, 1999, and in January 2000,

defendants filed amended Schedule 13D's. These amended schedules disclosed that defendants did in fact intend to take control of Vestcom. Next, on January 24, 2000, the SEC .promulgated new proxy rules under Section 14(a). The new rules removed the limitation on the number of shareholders one could solicit without triggering the obligation to file a written proxy statement.

Vestcom's defensive action with respect to Chopra was not confined to the institution of this litigation, however. On December 16, 1999, the day before the complaint was filed, Vestcom adopted a "Shareholder Protection Rights Agreement" (the "Shareholder Agreement") commonly referred to as a "poison pill" defense. In summary, and greatly simplified, the Shareholder Agreement provided that all shareholders would be issued transferrable rights (the "Rights") to purchase additional shares of Vestcom stock at a reduced price. These Rights would be triggered upon any person acquiring ten percent of Vestcom stock. The acquiring person's Rights, however, would be void.

Thus, an acquiring person's holdings would be immediately diluted and an attempt to purchase control foiled. The board retained an "out," however, and could redeem the Rights at a nominal cost. In this way, the board would be able to thwart a hostile takeover, but permit an acquisition of which it approved.

The vulnerability of this simple poison pill device is that insurgent shareholders and/or takeover artists may combine their stock purchases with a proxy fight. By replacing the board by election before triggering the pill by an acquisition of the stated percentage of stock, the insurgents can redeem the Rights and complete their purchase of the company. The response to this technique is either a so-called "dead hand" or "no hand" provision. A dead hand provision provides that only continuing directors, *i.e.*, directors in place when the poison pill was adopted, may vote to redeem the Rights. A no hand poison pill lacks any right of redemption at all, barring a purchase of the company by anyone. Of course, should all the continuing directors be ousted, the pill becomes a *de facto* no hand poison pill because no-one will remain that can vote to redeem the Rights.

Vestcom's Shareholder Agreement was a modified dead hand poison pill. Where the acquiring person intends a business combination, a majority of independent directors *or* a majority of continuing directors could vote to redeem the Rights. Independent directors were defined in the Shareholder Agreement as directors who are *not* 1) officers of Vestcom, 2) a party to the transaction, or 3) nominated by a party to the transaction. Where the acquiring person does not disclose an intention to cause a business combination, the pill was of the pure dead hand variety; it required a majority of continuing directors to redeem the Rights.

The Vestcom poison pill contains one last quirk. As noted, ten percent was the threshold for triggering the Rights, and acquiring that percentage or greater made one an Acquiring Person for the purposes of the poison pill. This threshold applied only to persons who owned less than ten percent when the pill was adopted. Persons who already owned greater than ten percent on the date the Shareholder Agreement was adopted could increase their holdings up to an additional two percent without triggering the Agreement. Defendants claim that this only includes two entities, a firm called Brookside Capital Partners Fund, L.L.P., (who appears to have no connection to this litigation), and Joel Cartun, the CEO and chairman of Vestom's incumbent board of directors.

Defendants' riposte in the struggle was a counterclaim seeking a declaration that the Shareholder Agreement is contrary to New Jersey law. The counterclaim alleged that the Shareholder Agreement 1) creates classes of directors without amending the certificate of incorporation, 2) disenfranchises shareholders because they

cannot vote in a board with the power to redeem the poison pill, and 3) creates an improper obstacle to shareholder's statutory right to call a meeting of shareholders.

The last event of significance occurred on April 19, 2000, well after this motion had been briefed. Vestcom amended the Shareholder Agreement to remove the continuing director provision. In light of the fact that the primary focus of the papers was the dead hand provision of the poison pill, the Court called for a supplemental round of letter briefs regarding the continued viability of defendants' motion with respect to the counterclaim.

Defendants maintain that the Shareholder Agreement, even as amended, still violates New Jersey law. Plaintiff contends that its claims too are still alive, and that defendants' revised Schedule 13D and the amendment of SEC Regulation 14a do not moot its complaint. These are the issues presented by the instant motions.

## DISCUSSION

### 1. The Summary Judgment Standard

The standard for deciding a motion for summary judgment has been stated many times by this Court and will be addressed only briefly here. Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986).

In this case, the basic facts are not in dispute. The contested issues are primarily legal, involving only interpretation of the relevant documents and their legality in light of the applicable law. Plaintiff's contend that additional discovery would reveal factual issues in support of their position, and cite Federal Rule of Civil Procedure 56(f)(summary judgment may be denied where party explains why it cannot present evidence in support of its position without further discovery). On the other hand, where the Court finds that the issue to which the requested Rule 56(f) discovery would be relevant is not material to the dispute, a Rule 56(f) objection will not defeat a motion for summary judgment.

### 2. Mootness of Count One and Two of the Complaint

 Under Article III of the United States Constitution, this Court lacks subject matter jurisdiction over a dispute that is moot. *International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths Forgers & Helpers v. Kelly*, 815 F.2d 912, 914–15 (3d Cir.1987)(hereinafter *"Boilermakers"*). Among other formulations, it is said that a case is moot when the parties "'lack a legally cognizable interest in the outcome.'" *Id.* at 915 (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Thus, whether the vindication of a party's legal position will lead to effective relief is a key indicator of an ongoing, live controversy. *National Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 489 (3d Cir.1992) ("A case is not moot if there is a 'real and substantial controversy admitting of specific relief through a decree of a conclusive character.'").

 The constitutional inquiry into mootness is complemented by prudential considerations. The Court must also weigh "whether the parties before it have, at the time for decision sufficient functional adversity to sharpen the issues for judicial resolution." *Dow Chemical Co. v. United States Environmental Protection Agency*, 605 F.2d 673, 678 (3d Cir.1979). "In operation, however, the mandatory constitutional aspects and the discretionary policy concerns of mootness analysis are often difficult to parse. Indeed, mootness is fundamentally a matter of degree; there is no precise test for ascertaining with precision whether a particular claim has become moot." *Boilermakers*, 815 F.2d at 915. In the appropriate case, these prudential factors may prevail even

where a case is not moot for constitutional purposes. *Id.* at 916 n. 3.

■ The parties concur that plaintiff, as the party invoking the power of this Court, bears the ultimate burden of demonstrating the existence of federal subject matter jurisdiction. *See* Plaintiff's Brief at 7 (citing *Cohen v. Kurtzman*, 45 F.Supp.2d 423, 427 (D.N.J.1999)(citing *Development Finance Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156, 158 (3d Cir.1995))). Although the federal courts are expected to make factual rulings regarding their subject matter jurisdiction, *Cohen,* 45 F.Supp.2d at 429, where questions of mootness are intertwined with the underlying merits of the controversy the Court will apply the summary judgment standard set forth above. *Horsehead Resource Dev. Co. v. B.U.S. Environmental Servs., Inc.,* 928 F.Supp. 287, 290 (S.D.N.Y.1996)("*Horsehead II*"); *Leslie v. United States,* 986 F.Supp. 900, 904 (D.N.J.1997)("where resolution of the jurisdictional question is intertwined with the merits of the action, a court is required to treat the motion as one for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), or as one for summary judgment pursuant to Fed.R.Civ.P. 56"), *aff'd,* 178 F.3d 1279 (3d Cir.1999).

Defendants have moved for summary judgment on the ground of mootness, claiming that subsequent events have called into question the continued viability of plaintiff's allegations of an inaccurate Section 13D filing, and violation of the pre-amendment proxy rules. First, the complaint seeks an injunction against further violations. Second, plaintiffs seek to enjoin further proxy solicitations. Third, plaintiff asks the Court to compel a curative disclosure to the SEC and shareholders explaining the alleged past violations. Last, the complaint demands that any proxies solicited to date be invalidated.

Certain of the remedies plaintiff originally sought in the complaint are clearly impossible to grant. Plaintiff does not argue that defendants' alleged proxy solicitations violate the amended Rule 14(a). Therefore, no prospective injunction against defendants' proxy activity can issue. Defendants have submitted the certification of Chopra attesting to the fact that no proxies had been solicited as of the beginning of February 2000. Certif. of Chopra ¶ 2. Plaintiff has not challenged this factual assertion nor asked for the opportunity to take discovery on this precise point. *See* Rule 56(f) Certif. of Gavin Rooney, Esq. Therefore, no proxies solicited in violation of the rules exist to be invalidated as prayed in the complaint.

What remains is plaintiff's demand for additional disclosures. Plaintiff argues that a "curative disclosure to the [SEC] and to all shareholders of Vestcom," would include a third amended Schedule 13D. In addition, plaintiff argues in support of this motion that the Court should order a direct communication from defendants to shareholders, admitting to violating the securities laws. Plaintiff maintains that the historic fact of the prior violations is material and must be directly disclosed, notwithstanding defendants' amended filings and the amendment of the proxy regulation. Thus, plaintiff contends, the disclosure in defendants' amended Schedule 13D of the existence of this lawsuit is not sufficient to moot the complaint.

It has been observed that the issue of mootness often arises in lawsuits based upon the alleged filing of a false Section 13D statement, because a corrective filing is a typical response to such an accusation. *Arvin Indus., v. Wanandi,* 722 F.Supp. 532, 540 (S.D.Ind.1989). The Supreme Court's statement of the purpose of the Williams Act is frequently cited in such cases:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress in-

tended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58–59, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975)(quoting S.Rep. No. 550, 90th Cong. 1st Sess., 3 (1967), H.R.Rep. No. 1711, 90th Cong.2d Sess., 4 (1968), *reprinted in* 1968 U.S.C.C. & A.N. 2811)).

It has been stated as the general rule that "once a subsequent 13D filing cures alleged omissions in prior filing, the § 13(d) claim alleging omissions must be dismissed as moot." *Horsehead Resource Dev. Co. v. B.U.S. Environmental Servs., Inc.*, 916 F.Supp. 305, 309 (S.D.N.Y.)("*Horsehead I*"), *vacated in part on other grounds, Horsehead II*, 928 F.Supp. 287; *Hubco, Inc. v. Rappaport*, 628 F.Supp. 345, 354 (D.N.J.1985)("Where an appropriate amendment to a 13D has been made the violation is usually considered cured.")(collecting cases); *see also IBS Fin. Corp. v. Seidman & Assocs.*, 954 F.Supp. 980, 986 n. 3 (D.N.J.1997), *rev'd in part on other grounds*, 136 F.3d 940 (3d Cir.1998). In a prominent case, the Second Circuit cited the "informative purpose" of the Schedule 13D requirement to find that an amended schedule and a period of four months following the amendment for shareholders to digest the new information removed the risk of irreparable harm from the previous filing. *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir.1980). The Fifth Circuit is in accord. *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 715 (5th Cir.1984)(reasoning of *Treadway* "is convincing").

*Treadway* and *Gearhart* are best read to preclude only equitable relief where an amendment has cured a section 13(d) violation. This does not diminish the force of these cases in this case, because the relief Vestcom seeks is exclusively equitable. No damages are sought in the complaint and the direct notification they seek to compel from defendants to the shareholders is in the nature of injunctive relief. The District Court in *USG Corp. v. Wagner & Brown*, 690 F.Supp. 625, 627 (N.D.Ill.1987) (cited at plaintiff's brief at 15), observed that a claim for damages in favor of shareholders who sold their stock in reliance on the prior, defective Schedule 13D survived the amendment. No such claim has been made in this case. In any event, such a claim would belong not to Vestcom, but to the shareholders allegedly harmed. *See also Gearhart*, 741 F.2d at 716.

The Court recognizes, however, that contrary case law exists, at least at the district court level. *See Arvin Indus. v. Wanandi*, 722 F.Supp. 532, 540–41 (S.D.Ind.1989) (identifying competing authority). Some of this authority is distinguishable. For example, *Wisconsin Real Estate Inv. Trust v. Weinstein*, 530 F.Supp. 1249 (E.D.Wis.1982) (plaintiff's brief at 15), dealt with proxy violations that had already been consummated by an election of a new board of trustees. The district court found that the past violations were not moot because of the ongoing taint of the elected trustees. *Id.* at 1251. In this case, of course, no such irrevocable step has taken place and any supposed taint from the original Schedule 13D may be remedied by subsequent events. Indeed, the *Wisconsin Real Estate* court found that where the relief sought was merely declaratory with respect to those directors whose terms had expired, the claim was moot. This branch of the *Wisconsin Real Estate* holding is more closely analogous to the situation at bar.

In *Arvin* (plaintiff's brief at 15), the defendant attempted to acquire a manufacturer of military equipment. 722 F.Supp. 532. He failed to disclose in a Schedule

13D not only his intention to take control, but also facts about himself including his ties to the Indonesian military and his financial background. *Id.* Here the fact allegedly not disclosed by defendants was related solely to the takeover attempt itself, *i.e.*, that they intended to replace the board of directors. The amended Schedule 13D rectified this supposed wrongdoing in a way that was impossible with respect to the *Arvin* defendant's background. In contrast to this remediable and essentially procedural error, the omissions in the *Arvin* case went to the personal history of the acquiring party and his suitability to control the target company. In sum, the omissions alleged in this case are different in kind and quality from the acquirer's misfeasance in *Arvin*.

At least two of the cases cited by plaintiff concern past violations of the proxy rules. *Wininger v. SI Management, L.P.*, 33 F.Supp.2d 838 (N.D.Cal.1998); *Wisconsin Real Estate*, 530 F.Supp. 1249. Of course, neither involve what is surely the unusual situation presented here, where alleged conduct in violation of the rules is quickly made legal by an amendment. The fact that the authorities altered the regulatory framework to permit the conduct with which defendants are charged goes far to undermining the argument that this conduct was so harmful as to work continued harm or to warrant intervention of this Court.

The Court recognizes, of course, holdings from other courts exist that can neither be completely distinguished nor reconciled with the general rationale of mootness espoused by *Treadway*. These cases can be read for the proposition that the fact of the prior, inaccurate filing, standing alone and regardless of any curative amendment, constitutes sufficient ongoing harm to save the case from mootness. *USG Corp.*, 690 F.Supp. at 627; *Arvin*, 722 F.Supp. at 541. Plaintiffs argue from them that it is a material fact that defendants were such scoundrels as to willingly, if briefly, violate the securities laws, and that Vestcom's shareholders must be informed accordingly.

■ Deciding whether a controversy is moot is a peculiarly fact-intensive exercise. *See Boilermakers*, 815 F.2d at 915, 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure 2d* § 3533 at 211–12. The legal and constitutional principles are intertwined with more "openly discretionary doctrines of remedial utility and judicial administration." *Id.* at 211; *Boilermakers*, 815 F.2d at 915. The Court believes that the weight of the better reasoned authority holds that an amended Schedule 13D will usually cure the previous violation. *Treadway*, 638 F.2d 357; *Gearhart*, 741 F.2d 707; *Energy Ventures, Inc. v. Appalachian Co.*, 587 F.Supp. 734, 744 (D.Del.1984); *Avnet, Inc. v. Scope Indus.*, 499 F.Supp. 1121 (S.D.N.Y.1980); *Hubco*, 628 F.Supp. 345. For instance, although *USG Corp.*, 690 F.Supp. at 627, held that a cured section 13(d) violation still warranted "forward-looking" relief, the case does not articulate precisely what interest would be served by such intervention. Even if the cases were otherwise, having careful regard for the facts at bar the Court would be constrained to grant defendants' motion.

■ First, the Court is persuaded by the analysis of *Treadway* that, where the informative purpose of section 13(d) is served, further controversy over the alleged violations is moot. Moreover, the equitable powers of this Court are strong medicine. Bedrock equity jurisprudence counsels against granting injunctive remedies where the harm complained of is cured by other means. In similar circumstances, the court in *Capital Realty Invs. Tax Exempt Fund Ltd. Partnership v. Dominium Tax Exempt Fund L.L.P.*, 944 F.Supp. 250, 260 (S.D.N.Y.1996) found that "[t]he practical realities of the situation" were that the parties themselves would convey the necessary information to the shareholders. Here too, given the hotly contested nature of this takeover bid, there can be no doubt that plaintiff will fully apprise any shareholder who will lis-

ten of defendants' alleged iniquities. The several months that have passed also suggest that any material information lacking from the initial Schedule 13D has long since been disseminated. *Cf. Treadway*, 638 F.2d at 380.

More than one court has rightfully expressed its wariness at being drawn into the quick and bitter warfare of a corporate takeover. The Supreme Court instructs in *Rondeau*, 422 U.S. at 58–59, 95 S.Ct. 2069, that the Williams Act must not be perverted into the tool of either management or insurgents. In *Hubco*, Judge Sarokin noted the undesirability of "rulings in the heat of battles for control, which inevitably upset the evenhandedness of the Williams Act as envisioned by Congress." 628 F.Supp. at 354.

■ The Court need not ignore the possibility that a Williams Act lawsuit might be brought merely for its chilling effect on challenges to incumbent management. *Id.* Plaintiff insists that defendants must either admit to the shareholders that they violated the securities laws, or that plaintiff is entitled to litigate and win a declaration from this Court that there was a violation. The implications of this argument are far too intrusive into private matters of corporate governance. Under plaintiff's rule, any statement (or omission) in a Schedule 13D could be challenged by management and bootstrapped into a live controversy if the insurgents did not make an admission of guilt in an amended Schedule 13D.

"[T]he securities laws may not be used as an indirect vehicle for litigating any and all of a party's sins." *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1502 (D.Del.1984). The cases hold that disclosure of the fact of a dispute and possible outcomes in the Schedule 13D is all that is required. *Horsehead I*, 916 F.Supp. at 312; *Warner Communications*, 581 F.Supp. at 1502; *Avnet*, 499 F.Supp. at 1124–26. Defendants disclosed the existence of this lawsuit and plaintiff's allegations with regard to the original Schedule 13D and the pre-amendment proxy solici-

tation. Plaintiff cannot avoid the mootness problem by claiming that defendants' filing remains false until they admit their prior, alleged wrongdoing.

■ Finally, plaintiff claims that the amended Schedule 13D is still deficient in that it fails to disclose an intent by defendants to acquire an additional ten percent of Vestcom stock. Plaintiff cites no authority for the proposition that a reporting person must state exactly how much stock he intends to acquire. In fact, defendants' final, amended Schedule 13D states that they may, in fact, purchase more stock. The Court finds this disclosure sufficient. Any discrepancy is *de minimus*, particularly in light of defendants' fully aired plan to take control of the company.

### 3. The Shareholder Agreement.

■ There is no real dispute that a simple poison pill diluting the holdings of a person who acquires a stated percentage of a company's stock is legal. The Shareholder's Protection Act provides:

> ... [A] corporation may ... authorize and issue rights or options which include conditions that prevent the holder of a specified percentage of the outstanding shares of the corporation, including subsequent transferees of the holder, from exercising those rights or options ....

N.J.S.A. 14A:7–7(3). The question is whether the dead hand provision is legal under New Jersey law. Obviously, the amendment of the Shareholder Agreement affected the resolution of this issue.

The inescapable truth is that the heart of defendants' counterclaim against the Shareholder Agreement was the continuing director provision. As originally framed, this dispute presented a subtle and unsettled question of New Jersey corporate governance. Like plaintiff in similar straits, defendants persist in the face of the amendment, claiming that the independent director provision and the special provision for large shareholders still are illegal.

As amended, the Shareholder Agreement provides that, if there is a business combination pending, only a majority of Independent Directors can cause a redemption of the Rights. Absent a pending business combination, a simple majority of the board can redeem. Of course, each of these scenarios assumes that the Rights have been triggered by the acquisition by a person or entity of greater than ten percent of Vestcom's stock.

In addition, the amended Shareholder Agreement narrowed the category of persons considered non-Independent Directors ineligible to vote to redeem the Rights. Previously, any director nominated by a person who was a party to a transaction with the company could not become an Independent Director. Following the amendment, only Affiliates or Associates of a party were disqualified. The Shareholder Agreement incorporates the definitions of Affiliate and Associate set forth in Rule 12b–2 of the 1934 Act. An Affiliate is a person controlled by the principal; an Associate is an entity owned by the principal, a trust in which the principal has a beneficial interest, or a relative or spouse of the principal. 17 C.F.R. § 240.12b–2.

 The threshold problem for defendants' is one of standing. Article III of the United States Constitution limits the subject matter of the federal courts to "cases and controversies." Hornbook law holds that the cases and controversies requirement means that a claimant must "show he personally has suffered some actual or threatened injury." *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation omitted). "[T]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Moreover, assuming an injury exists, it must appear that the relief sought will redress it. *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)

It is dubious on the record before the Court that defendants are actually injured by the now-truncated dead hand provision of the poison pill, or that excising it from the poison pill would provide relief to them. The evolution of the parties' arguments illustrates the problem.

Prior to the amendment of the Shareholder Agreement, plaintiff argued that defendants intended a business combination. This, plaintiff maintained, would trigger only the allegedly less offensive Independent Director dead hand, not the more egregious continuing director provision. In the alternative, plaintiff claimed under Rule 56(f) that it was entitled to discovery to develop evidence proving that defendants intended a business combination. *See* Rule 56(f) Certif. of Gavin Rooney, Esq.

Defendants, while not conceding that the Independent Director provision was legal, argued in reply that there was no evidence that they intended a business combination. Therefore, defendants claimed, they were squarely subject to the continuing director dead hand. The continuing director provision was clearly the more formidable obstacle to a takeover, because voting out all the incumbents would render the Rights non-redeemable by anyone. It was also more vulnerable to legal challenge, or at least so defendants contended.

Thus, whether by plaintiff's design or otherwise, defendants committed themselves to the position that they did not intend a business combination. *See, e.g.,* Defendants' Reply Brief at 3. In fact, that is consistent with defendants' statement in their amended Schedule 13D:

... the Reporting Persons do not have any present plans or proposals which relate to or would result in any of the following (although the Reporting Persons reserve the right to develop such plans or proposals): (I) an extraordinary

corporate transaction, such as a merger, reorganization or liquidation involving Vestcom, or any of its subsidiaries . . . .

Napolitano Certif. in Support of Motion to Dismiss Complaint, Exh. A at 6 (Second Amended Schedule 13D).

What followed, of course, was the amendment to the Shareholder Agreement eliminating the continuing director dead hand and, along with it, any restriction on which directors might vote to redeem the Rights where there is no pending business combination. Consequently, as far as is apparent in the record before the Court, the clear possibility exists that the remaining dead hand provision of the Shareholder Agreement will have no effect on defendants' attempt to gain control of Vestcom. Defendants may be free to replace the board by way of a proxy contest, redeem the Rights, and purchase a controlling interest in Vestcom. Removing the Independent Director/business combination dead hand would not advance defendants' cause in the fight for Vestcom.

■ Thus, serious questions exist regarding defendants' continued standing to challenge the Shareholder Agreement. It is far from clear that they have sustained the requisite injury, or that the relief they seek would redress any perceived harm. Defendants assert that the threat remains that Vestcom could reenact the Continuing Director provision. As plaintiff correctly observes, however, any New Jersey corporation could enact such a provision. This hardly suffices to create an injury that is "real and immediate, not conjectural or hypothetical." *Lyons*, 461 at 101–02, 103 S.Ct. 1660. In sum, whether defendants intend a business combination, or not as their own papers maintain, is a question of fact material to the issue of standing and precludes summary judgment on the counterclaim.

■ Defendants also maintain their objection that the Shareholder Agreement illegally creates separate classes of stock. As noted, they base this argument on the fact that persons who owned greater than ten percent of the stock when the Share-

holder Agreement was adopted are permitted to acquire an additional two percent without triggering the Rights.

The Court rejects defendants' argument. The poison pill statute, N.J.S.A. 14A:7–7, does not specifically preclude treating the holders of different amounts of shares differently with respect to the triggering or voiding of rights or options. In fact, it makes no mention of what must be done with shareholders who already own greater than the "specified percentage" on the date the rights or options are issued. N.J.S.A. 14A:7–7(3). The problem of pre-existing, large stakeholders is simply an omitted case from the structure of the poison pill statute.

The Court believes that the solution crafted by the Vestcom Shareholder Agreement is sensible and in keeping with the overall scheme of the poison pill statute. Large, pre-existing stakeholders are not exempted from the poison pill. Indeed, a far smaller incremental increase in their holdings (two percent) will trigger dilution than will trigger dilution for an outsider. One could argue that consistency would require that large stakeholders be permitted to increase their holdings the same ten percent that is allowed an outsider. This would hardly benefit insurgents like defendants, however, who would then be faced with a yet more powerful block of opposing shares. Prohibiting pre-existing large stakeholders from increasing their holdings at all without suffering dilution would be draconian and unjustifiable, particularly in the absence of any express statutory mandate to that effect.

It is true that there is a facial disparity of treatment between large and small shareholders in the Vestcom Shareholder Agreement. As discussed, the effect of this disparity is not necessarily to the benefit solely of the pre-existing large stakeholder. Moreover, the poison pill statute expressly approves the principle of disparate treatment based upon the size of the shareholder's holding. That is the essence of the concept of voiding shareholder

rights or options based upon an acquisition of a certain percentage of the stock. In the context of defensive poison pills, the New Jersey legislature has created a limited abrogation of the principle of equal treatment of stockholders. The Vestcom Shareholder Agreement's treatment of large stakeholders is in that spirit, and the Court will not interfere.

### CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment on counts one and two of the complaint against them will be granted and the complaint will be dismissed in its entirety with prejudice. Defendants' motion for summary judgment on their counterclaim will be denied.

An appropriate Order is attached.

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 14th day of September, 2000

ORDERED that defendants' motion for summary judgment on the complaint against them is granted and the complaint is dismissed with prejudice; and it is further

ORDERED that defendants' motion for summary judgment on their counterclaim is denied.